Nancy WENDERHOLD, Plaintiff,

v.

CYLINK CORPORATION,
et al., Defendants.

Harold Lerner, Plaintiff,

v.

Cylink Corporation, Defendant.

Chad B. Poling, Plaintiff,

v.

Cylink Corporation, Defendant.

Max Silberman, Plaintiff,

v.

Cylink Corporation, Defendant.

Harry Vassilakos, Plaintiff,

v.

Cylink Corporation, Defendant.

Hans. L. Von Schweinitz, Plaintiff,

v.

Cylink Corporation, Defendant.

Lawrence J. Plisskin, Plaintiff,

v.

Cylink Corporation, Defendant.

Nos. C 98–4292 VRW, C 98–4296 VRW, C 98–4360 VRW, C 98–4536 VRW, C 98–4603 VRW, C 98–4673 VRW, C 98–4757 VRW.

United States District Court,
N.D. California.

Oct. 26, 1999.

WALKER, District Judge.

On September 3, 1999, the court entered an order consolidating these securities class

actions, provisionally certifying a class, provisionally designating Jonny Alpern as lead plaintiff and requesting competitive bids from lawyers seeking designation as class counsel. See *Wenderhold v. Cylink Corp.,* 188 F.R.D. 577 (N.D.Cal.1999). By September 30, 1999—the deadline for class counsel bids—the court had received but a single proposal. This is surprising as six firms initially sought to represent a class of Cylink stock purchasers in pursuing the claims at bar. In any event, the law firm of Abbey, Gardner & Squitieri was the sole bidder.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper. This duty exists independent of any objection [from a member of the class]." *Zucker v. Occidental Petroleum,* 192 F.3d 1323 (9th Cir.1999). For the reasons stated below, the court finds the Abbey bid unacceptable.

In evaluating Abbey's bid for designation as class counsel, the court is guided by Rule 23 and prior cases in which courts have tackled the often vexing subject of attorney fees in common fund class actions. See *Sherleigh Associates v. Windmere–Durable Holdings,* 184 F.R.D. 688 (S.D.Fla.1999); *In re Cendant Corporation Litigation,* 182 F.R.D. 144 (D.N.J.1998). See also *In re Amino Acid Lysine Antitrust Litigation,* 918 F.Supp. 1190 (N.D.Ill.1996) (fee shifting statute applicable). The undersigned has examined elsewhere the advantages of the *ex ante* percentage fee bidding approach employed here over *ex post* lodestar and benchmark percentage fee calculations. See *In re Oracle Securities Litigation,* 131 F.R.D. 688 (N.D.Cal.1990) (*Oracle I* ), 132 F.R.D. 538 (1990) (*Oracle II* ), 136 F.R.D. 639 (1991) (*Oracle III* ); *In re Wells Fargo Securities Litigation,* 156 F.R.D. 223 (N.D.Cal.1994); *In re California Micro Devices Securities Litigation,* 168 F.R.D. 257 (N.D.Cal.1996). The first important step in the evolution of the judicial approach to fee determinations in this context was from the lodestar to percentage-of-the-fund method. See, e.g., *In re Activision Securities Litigation,* 723 F.Supp. 1373 (N.D.Cal.1989) (criticizing lodestar and discussing, but not applying, fixed benchmark percentages). The next key development—variable percentages—crystallized with the use of the competitive bidding process to establish fees at the outset of the litigation. *Oracle II,* 132 F.R.D. at 542–43 (noting that competitive bidding elicited variable percentages, a "feature notably lacking in the judge-devised benchmark percentage fee" approach). While the presence of only one bid in this case dulls the edge of the competitive selection process, the benefit of variable percentages has not been lost.

In examining variable percentages, this court has identified

two features of class counsel fees that would emerge from a process [that] most closely approximates the way class members themselves would make *** decisions about class counsel fees and costs:

1. The ratio of fees and expenses to recovery should *decline* as recovery increases; and

2. The ratio of fees and expenses to recovery should *increase* as the amount of attorney effort necessary to produce the recovery increases.

*Oracle III,* 136 F.R.D. at 649 (emphasis supplied, citation omitted). In other words, a reasonable fee is likely to be one in which "class action plaintiffs' lawyers obtain a smaller fraction of the total recovery the larger the recovery is, and a greater fraction of the total recovery the longer they must wait to be paid." W. Lynk, "The Courts and the Market: An Economic Analysis of Contingent Fees in Class Action Litigation," 19 J Legal Stud 247, 258 (1990). In evaluating bids, then, the court should scrutinize not only the fee percentages but the gradation of those percentages with respect to (1) the amount of recovery and (2) the stage in the litigation at which recovery is achieved.

Here arises the first problem with Abbey's bid. In the firm's proposed fee schedule, attached as Exhibit A to this order, fee percentages *increase* both as the litigation progresses *and with the amount of recovery.* Obviously, this is inconsistent with the idea that the ratio of fees to recovery should *decline* as recovery increases. The firm's

explanation of this aspect of its fee proposal is puzzling. In contrast to the fee schedule, the text of the proposal states: "As the amount of any classwide recovery increases, the percentage award *decreases*." See Abbey Bid for Designation as Lead Plaintiffs' Counsel (Doc. 49) at 8 (emphasis supplied). Putting aside this inconsistency, the court has evaluated the proposal based on the numbers as scheduled; the court would expect Abbey to clarify this point on any subsequent proposal.

The rationale supporting a declining percentage is that increasing amounts of recovery do not require correspondingly increased levels of attorney effort and that these economies of effort should be shared with the class. See *Oracle II,* 132 F.R.D. at 543. On the other hand, there is possible justification for Abbey's increasing percentage scheme (though Abbey has not provided any). Advocates of this approach argue that a percentage fee that increases with larger recoveries creates a disincentive for class action lawyers to settle prematurely and too cheaply. See *id.* at 544. In *In re Nasdaq Market Makers Antitrust Litigation,* Judge Sweet rejected a declining percentage approach in favor of a flat 14 percent award. 187 F.R.D. 465, 488 (S.D.N.Y.1998). In so doing, he accepted an argument by Professors Issacharoff and Miller that percentage fees "should not be [ ] inverse to the size of the recovery." The professors contended that "a downward sliding scale rewards lawyers for the part of the work that is easiest and encourages early settlement often to the detriment of the class ***." *Id.* at 487. Following this logic, one could arrive at the conclusion that percentages should increase with the amount of recovery to avoid the "sell-out settlement" problem. For Judge Posner's description of this problem in the FRCP 68 context, see *Chesny v. Marek,* 720 F.2d 474, 478–79 (7th Cir.1983), rev'd on other grounds, 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985).

But as this court has explained on a previous occasion, the argument for increasing percentages is unpersuasive because it assumes a 1:1 linear relationship between additional recovery and additional attorney effort.

The "sell-out settlement" or "underinvestment" problem to be corrected is insufficient attorney effort to realize the optimal level of class recovery. But an increasing percentage rewards additional recovery, not additional effort. Amount of recovery is thus used (perhaps inadvertently) as a surrogate for attorney effort. But amount of recovery in litigation does not equate with the amount of effort necessary to realize it.

Recovery reflects many factors other than attorney effort. These include quality and availability of evidence and witnesses, state of the law and willingness of the defendant to fight, among other things. Increasing the percentage of class counsel's share of the recovery could thus produce attorney windfalls unrelated to the quality or quantity of attorney services provided.

*Oracle II,* 132 F.R.D. at 544. The benefits of a decreasing percentage scheme (economies of effort inuring to the class) are concrete while the theoretical effect of an increasing percentage on the "sell-out" problem would seem illusory.

Nevertheless, the increasing percentage scheme is not fatal to the Abbey proposal because a colorable (if to the undersigned unpersuasive) argument exists that such a fee arrangement is in the interests of the class. A competing proposal that took the opposite approach (decreasing percentages as recovery increases) would obviously be more attractive. But, of course, here there is—as yet—no such competing bid and the Abbey bid is not rejected on that basis.

■ The defect in the Abbey proposal which renders it unacceptable is its distinction between the methods for awarding fees and for reimbursement of expenses. The court's September 3, 1999, order calling for submission of bids expressly stated that proposals should set forth "the percentage of any recovery the firm will charge in the event of a recovery as fees *and costs* for all work performed in connection with the case ***." See Order at 25. Abbey's proposal, however, states that the firm will seek reimbursement of expenses (presumably above

and beyond its fee percentage) out of any fund created as a result of the litigation.

The court will not permit Abbey to so divorce its recovery of fees and costs. Such an arrangement encourages counsel to inflate costs calculations, since any reimbursement of costs will supplement the percentage fee award. It creates an incentive for the firm to categorize as costs anything that could conceivably be so considered and diminishes the incentives for the firm to economize by choosing the optimal mix of attorney effort and non-attorney inputs. This is of particular concern in the digital age, in which the line between expenses indirectly related to attorneys and hands-on attorney work can vanish into cyberspace. See "The Cybersuit: How Computers Aided Lawyers in Diet–Pill Case," The Wall Street Journal, Oct. 8, 1999, at B1. Much of what previously, and perhaps traditionally, has been characterized as a reimbursable expense is to some degree a substitute for attorney effort. For example, computer, database and internet connection charges for legal and factual research and investigation are in varying degrees substitutes for attorney or paralegal library work, document review and witness interviews. Class counsel should have the incentive to choose the optimal (or least costly) mix of inputs. Compensation which covers attorney effort *and* all other expenses affords that incentive, while a percentage award that omits non-attorney expenses does not.

The court, therefore, rejects the Abbey firm's bid for designation as class counsel. Since there is no acceptable bid, the court finds it necessary to extend the bidding period. Of course, the court's rejection of Abbey's current proposal does not preclude that firm, which the court finds is otherwise well-qualified to represent the class, from submitting an amended bid that comports with this order and the September 3 orders. But the extended bidding period shall be open to all comers.

■ Any lawyer or law firm that seeks to be designated class counsel for claims against one or more defendants shall submit its proposal for such representation in the clerk's office on or before 4:30 pm, November 22, 1999, and shall file the bid ex parte, under seal. Joint proposals will not be considered. Class counsel will, however, be allowed to spread its risk by farming out tasks in its prosecution of its case; but class counsel shall be required to pay any other firm participating in prosecuting the action out of class counsel's fee. The submitted proposals shall identify each defendant from which recovery is sought and set forth:

(1) the firm's experience in securities class action litigation and the background and experience of those lawyers in the firm who, it is anticipated, will be engaged in representing the class in the present litigation, including the terms and fee arrangements under which such representation took place;

(2) the bona fide qualifications of the firm to complete the work necessary for representation of the class, including the willingness of the firm to post a completion bond or other security for the faithful completion of its services to the class, and the terms of any such bond or security;

(3) the firm's insurance coverage for malpractice;

(4) evidence that the firm has evaluated the case, including specifically the range and probability of recovery;

(5) the percentage of any recovery the firm will charge in the event of a recovery as fees and costs for all work performed in connection with the case set forth on the Fee Schedule Grid, affixed as Appendix B below. This shall include an explanation of the percentage fee arrangement involving a straight, increasing or decreasing fee percentage based on the overall amount of recovery through monetary increments and/or stage of recovery at which litigation is reached;

(6) a certification on behalf of the firm that (a) its proposal was prepared independently of any other firm, entity or person not affiliated with the firm, (b) no part of the proposal was disclosed to anyone outside the firm prior to filing with the court and (c) the proposal was prepared without direct or indirect consultation with other firms that have filed actions on behalf of the proposed class in this matter, or entered an appearance in any fashion.

The court notes that counsel located within this district will not necessarily receive more favorable consideration simply because of their location. This order in no way prevents any individual member of the putative class who opts out of the class from hiring the attorney of his or her choice in this matter.

IT IS SO ORDERED.

## APPENDIX A

Abbey Firm's Application for Class Counsel

Fees as Percentage (%) of Total Class Recovery

|  | From Pleading Through Motion to Dismiss | After Motion to Dismiss Through Adjudication of Summary Judgment | After Adjudication of Summary Judgment Motions Through Trial Verdict | After Trial Verdict Through Final Appellate Determination |
|---|---|---|---|---|
| First $500,000 | 5 | 10 | 15 | 17 |
| $500,001– $1,000,000 | 6 | 11 | 15 | 17 |
| $1,000,001– $5,000,000 | 7 | 12 | 17 | 17 |
| $5,000,001– $10,000,000 | 8 | 13 | 18 | 18 |
| $10,000,001– $15,000,000 | 9 | 14 | 19 | 19 |
| $15,000,001– $20,000,000 | 10 | 20 | 25 | 25 |
| Over $20,000,000 | 15% | 22% | 30% | 30% |

## APPENDIX B - FEE AND EXPENSE BID SCHEDULE