**In re ORACLE SECURITIES LITIGATION.**

**This Document Relates To: ALL ACTIONS.**

**No. C–90–0931–VRW.**

United States District Court, N.D. California.

May 6, 1991.

As Modified May 21, 1991.

C. Oliver Burt, III, Greenfield & Chimicles, Haverford, Pa., Jules Brody, Stull, Stull & Brody, Arthur N. Abbey, Mark Gardy, Abbey & Ellis, Max W. Berger, Bernstein, Litowitz, Berger & Grossman, Lawrence A. Sucharow, Jonathan M. Plasse, Goodkind, Labaton & Rudoff, Stanley Grossman, Pomerantz, Levy, Haudek Block & Grossman, New York City, Michael S. Glassman, Clemens, Glassman & Clemens, Los Angeles, Cal., Glen DeValerio, Berman, DeValerio & Pease, Boston, Mass., Robert N. Kaplan, Richard J. Kilsheimer, Kaplan & Kilsheimer, New York City, Eugene A. Specter, Eugene A. Specter & Associates, Philadelphia, Pa., Joseph J. Tabacco, Jr., Stamell, Tabacco & Schager, Daniel W. Krasner, Francis M. Gregorek, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Leonard Barrack, Gerald J. Rodos, Barrack, Rodos & Bancine, Philadelphia, Pa., Edward M. Gergosian, Barrack, Rodos & Bacine, San Diego, Cal., Richard B. Dannenberg, Neil L. Selinger, Henry Brachtel, Lowey, Dannenberg, Bemporad, & Selinger, P.C., Jeffrey H. Squire, Roger Kirby, Kaufman, Malchman, Kaufmann & Kirby, New York City, Michael D. Howard, Kinsella, Boesch, Fujikawa & Towle, Los Angeles, Cal., Robert Harwood, Wechsler, Skirnick, Harwood, Halebian & Feffer, New York City, Stuart H. Savett, Kohn, Savett, Klein & Graf, Sherrie R. Savett, Robert P. Frutkin, Berger & Montague, P.C., Philadelphia, Pa., David B. Gold, Paul F. Bennett, Alan R. Plutzik, Law Offices of David B. Gold, San Francisco, Cal., Michael Craig, Schiffin & Craig, Chicago, Ill., Bertram Bronzaft, Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, Stephen Oestreich, Wolf, Popper, Ross, Wolf & Jones, New York City, Elizabeth J. Cabraser, Lieff, Cabraser & Heimann, San Francisco, Cal., Elwood Simon, Schlussel, Lifton, Simon, Rands, Galvin & Jakeir, Southfield, Mich., Steve W. Berman, Betts, Patterson & Mines, Seattle, Wash., Robert M. Roseman, Rudolph, Seidner, Goldstein, Rochestie & Salmon, Philadelphia, Pa., Guido Saveri, Saveri & Saveri, San Francisco, Cal., David J. Bershad, Milberg, Weiss, Bershad, Specthrie & Lerach, David Jaroslawicz, Law Firm of David Jaroslawicz, Joseph H. Weiss, Law Offices of Joseph H. Weiss, New York City, Ernest T. Kaufmann, Kaufman, Malchman, Kaufmann & Kirby, Los Angeles, Cal., Andrew J. Ogilvie, Law Office of Andrew J. Ogilvie, San Francisco, Cal., William S. Lerach, Alan Schulman, Milberg, Weiss, Bershad, Specthrie & Lerach, San Diego, Cal., Richard Appleby, New York City, and Arthur T. Susman, Susman, Saunders & Buehler, Chicago, Ill., for plaintiffs.

Melvin R. Goldman, Darryl P. Rains, Morrison & Foerster, San Francisco, Cal., Raymond L. Ocampo, Brenda G. Woodson, Oracle Systems Corp., Redwood Shores, Cal., Frederick S. Fields, Stan G. Roman, Richard Walker, Bronson, Bronson & McKinnon, and Laurence M. Popofsky, and Michael Rugen, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants.

### ORDER DENYING MOTIONS FOR RECONSIDERATION AND GRANTING CLASS COUNSEL'S MOTION FOR STAY AND SETTING STATUS CONFERENCE.

WALKER, District Judge.

The Law Office of David B. Gold has moved the court to set aside its earlier orders[1] and to substitute the Gold firm as class counsel in place of Lowey, Dannenberg, Bemporad & Selinger, P.C. The Gold firm contends that the Lowey bid was unethical and competitive selection of class counsel and determination of their compen-

---

1. *In re Oracle Securities Litigation,* 131 F.R.D. 688, 132 F.R.D. 538 (N.D.Cal.1990).

sation illegal. After making this motion, the Gold firm amended its complaint in the *Degooyer* case[2] to name Oracle's auditor, Arthur Andersen & Co., presumably in an effort to carve out a separate class action against that defendant. The Lowey firm opposed the reconsideration motion and sought to stay *Degooyer*, arguing that the Gold firm was really after attorney fees "and a monopoly over securities actions prosecuted in this Court." Class Pls.Reply Mem. at 1. A lively hearing on these motions[3] followed on March 20, 1991, punctuated by verbal blasts among the plaintiff lawyers. Then, reminiscent of the concord produced by the court's first suggestion of a competition for class counsel, 131 F.R.D. at 690, and in the wake of a March 26 press release by Oracle that its previously issued financial statements and related auditors' report should not be relied upon, the Gold and Lowey firms found common ground. On April 2, these firms together brought a new class action on behalf of a class of Oracle shareholders solely against Arthur Andersen, *Greg Cronin, et al. v. Arthur Andersen & Co.*, No. 91–0945 VRW. Following these events, the court called for further briefing which was completed on April 24.

Both the Lowey and Gold firms seek to add Arthur Andersen as a defendant although the firms differ in their view of the appropriate claims or class periods to assert against that defendant. The Lowey firm wishes to continue against the existing defendants under the terms of its bid, but states that the claim against Arthur Andersen should be treated separately. The Gold firm, on the other hand, points to Oracle's March 26 release and argues that the competitive selection of class counsel

"did not and could not take such changed circumstances into account," Gold Resp. filed April 24, 1991 at 6, giving further reason for the court to vacate its earlier orders and abandon competitive selection of class counsel. This order addresses those matters.

For the reasons which follow, the court concludes that competitive selection of class counsel has worked well.[4] The Gold firm's attack on the legality and suitability of competitive selection fails analysis and ignores courts' inherent power to protect against excessive attorney fees, *In re Michaelson*, 511 F.2d 882, 888 (9th Cir.1975), cert. denied 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975), and the Ninth Circuit's urging that district judges handling class actions "inquire early in the proceedings what mode of recovery of fees the attorneys of the plaintiff class anticipate utilizing." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1312 (9th Cir.1990) (Sneed, J., concurring). Far from pointing up one of competitive selection's drawbacks, the changed circumstances surrounding Oracle's March 26 release and the addition of Arthur Andersen as a defendant demonstrate a particular strength of competitive selection: increased ability of the court to monitor this litigation to protect the class and the integrity of the class action device. As will be explained, these advantages stand in marked contrast to the lodestar and benchmark approaches which rely on determinations that are "exceedingly inexact and often apparently arbitrary in operation" and "extraordinarily uncertain in application." J. Macey and G. Miller, "The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic

---

**2.** *Degooyer v. Oracle Systems Corp., et al.*, No. C–90–1264–VRW. The Gold firm basically copied the amended *Degooyer* complaint from the consolidated class action complaint filed two months earlier by the Lowey firm.

**3.** The Law Office of Joseph H. Weiss also sought reconsideration of the earlier orders, claiming that two classes of Oracle shareholders should be certified with separate class counsel. The Weiss firm naturally enough volunteered for one of these positions, but its motions are meritless.

**4.** Despite its relative novelty, competitive selection permitted designation of class counsel and determination of their compensation expeditiously: three weeks for submission of bids, *In re Oracle Securities Litigation*, 131 F.R.D. 688, 697 (N.D.Cal.1990), and seven weeks for their analysis and preparation of an explanatory order, 132 F.R.D. 538. With greater experience, the latter interval should considerably shorten and, of course, rearguard maneuvers of the sort addressed in this order will fall away.

Analysis and Recommendations for Reform," 58 U.Chi.L.Rev. 1, 52, 54 (1991).

## I. THE GOLD FIRM'S MOTION FOR RECONSIDERATION.

■■■ The Gold firm's central argument against competitive selection misreads the rules of professional conduct and would substitute the money illusion for attorney ethics. Because litigation expenses herein presumably will exceed the Lowey bid's $325,000 limitation on reimbursement therefor,[5] the limitation will probably force the Lowey firm to pay for some litigation expenses out of its own pocket. The Gold firm argues that this possibility will deter the Lowey firm from incurring the expenses necessary to maximize the class' recovery. Moreover, the limitation will permit defendants, knowing of the limitation, to put the "squeeze" on the Lowey firm as litigation expenses approach and then exceed the reimbursable amount. Gold Mem. filed November 19, 1990 ("Gold Mem.") at 15. The limitation thus creates a "conflict of interest" between the class and the Lowey firm and breaches that firm's ethical duty to be free of such conflicts. *Id.* at 13–14.

According to the Gold firm, the ABA Model Rules of Professional Conduct mandate an ethical distinction between a lawyer's out-of-pocket payment of litigation expenses and the opportunity costs of the lawyer's effort on litigation.[6] Rule 1.7(b) thereof prohibits a lawyer's representation of a client that may be "materially limited * * * by the lawyer's own interests" while Rule 1.8(j) prohibits a lawyer's acquisition of a "proprietary interest in the litigation."

The Gold firm argues that a limitation on reimbursement violates these provisions by giving the Lowey firm an "interest in the litigation which goes beyond any of the exceptions to the rules" of ethics by requiring an " 'investment' by the lawyer in the litigation which will not be paid back *even if the client wins the case.*" Gold Mem. at 14 (emphasis in original). In the view of the Gold firm, this "destroys counsel's independent judgment." *Ibid.*

In fact, the ABA Model Rules afford no textual support for this argument. Under the Model Rules, "a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter." ABA Model Rule 1.8(e)(1). The Model Rules do not require *full* repayment or limit the outcomes upon which a reimbursement obligation may be contingent. The ABA Model Code of Professional Responsibility, displaced by the Model Rules in 1983, allowed a lawyer to advance litigation expenses "provided the client remains ultimately liable for such expenses." ABA Model Code of Professional Responsibility, DR 5–103(B). Omission of any reference to ultimate client liability for litigation expenses makes clear that in adopting the Model Rules, the ABA abandoned the very requirement for which the Gold firm now contends. Moreover, this change reflected actual practice because, even before adoption of the Model Code in 1969, most contingent fee lawyers had long since given up pressing clients for repayment of expenses if no recovery was obtained. F. Mac-

---

5. Although the court assumes *arguendo* that $325,000 will not cover the expenses of this litigation, 132 F.R.D. at 542, other securities class actions involving substantial recoveries have entailed expenses in line with, or less than, this amount. *See, e.g., In re Baldwin–United Corp. Lit.,* 1986 Fed.Sec.L.Rep. ¶ 92,918, 1986 WL 12195 (recovery of $183.8M, costs of $397,-186.03); *Rievman v. Burlington Northern R. Co.,* 118 F.R.D. 29 (S.D.N.Y.1987) (recovery of $35.5M, costs of $231,669.17); *In re General Public Utilities Securities Litigation,* 1984 Fed. Sec.L.Rep. ¶ 99,566, 1983 WL 22362 (recovery of $20.4M, costs of $159,680); *In re Public Service Co. of Indiana Securities Lit.,* 125 F.R.D. 480

(S.D.Ind.1988) (recovery of $20.8M, costs of $230,402.97); *In re Warner Communications Securities Lit.,* 618 F.Supp. 735 (D.C.N.Y.1985), affirmed, 798 F.2d 35 (2d Cir.1986) (recovery of $18.6M, costs of $124,090.08); *In re Cincinnati Gas & Elec. Co. Securities Lit.,* 643 F.Supp. 148 (S.D.Ohio 1986) (recovery of "nearly" $14M, costs of $59,905.69).

6. The ABA Model Rules are not binding on lawyers admitted to practice before this court which instead applies the California Rules of Professional Conduct. N.D.Cal.L.R. 110–3. With regard to reimbursement of expenses, however, the Model Rules and the California Rules do not differ.

Kinnon, Contingent Fees for Legal Services at 69 (1964).

Even if the ABA had not abandoned it, the reimbursement requirement would be inappropriate and impractical in a class action. Courts should not "mechanically transpose to class actions the rules developed in the traditional lawyer-client setting context." *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 163 (3rd Cir.1984) (Adams, J., concurring), cert. denied *Cochrane & Bresnahan v. Plaintiff Class Representatives*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). To do so could emasculate the class action device on the basis of "outmoded and unrealistic concepts of ethics." *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1414, 1415 (E.D.N.Y.1989) (Weinstein, J.), *modified*, 907 F.2d 1295 (2d Cir.1990).

To the extent ultimate client liability for litigation expenses serves useful purpose, it is to protect contingent fee lawyers against feckless clients by making them put up something to lose. K. Clermont and J. Currivan, "Improving the Contingent Fee," 63 Cornell L.Rev. 529, 532 n. 3 (1973). Cf: *Rand v. Monsanto Co.*, 926 F.2d 596, 600 (7th Cir.1991). This objective is wholly unsuited to class actions. It is not class counsel, but the class, which needs protection. See, 645–646, infra. In any case, the class is definitionally uninvolved and recoupment of litigation expenses from the class or class representative is a practical impossibility. *Rand v. Monsanto Co.*, 926 F.2d at 600. To require recoupment of litigation expenses from the class representative is at odds with Rule 23, *ibid.*, and even to permit discovery into the class representative's ability to reimburse class counsel is a "preposterous charade." J. Macey and G. Miller, "Plaintiffs' Attorney's Role in Class Action and Derivative Litigation," 58 U.Chi.L.Rev. 1, 84–91 (1991). Surely, the Gold firm—having prospered from class litigation—cannot escape the irony that the ethical precept it now ad-

vances is a "relic of the rules against champerty and barratry," *Rand v. Monsanto Co.*, 926 F.2d at 600, and has been mostly used to impede and frustrate class actions. See, e.g., *In re Mid–Atlantic Toyota Antitrust Litigation*, 93 F.R.D. 485, 489–491 (D.Md.1982), affirmed, 704 F.2d 125 (4th Cir.1983) (DR 5–103(B) prohibits certification unless class representative agrees to reimburse class counsel); *Lim v. Citizens Savings and Loan Assn.*, 430 F.Supp. 802, 812–813 (N.D.Cal.1976); *Palmer v. BRG of Georgia, Inc.*, 874 F.2d 1417, 1420–1421 (11th Cir.1989), reversed on other grounds, —— U.S. ——, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990).[7]

Equally unfit is the Gold firm's contention that the reimbursement limitation presents a "conflict of interest" because it will diminish the Lowey firm's devotion to maximizing the class' recovery. The Lowey firm stands to benefit from this litigation in the proportion that its percentage fee bears to the size of the class' recovery. If expenditures on expert witnesses, attorney travel, and the assortment of other items typically funded by out-of-pocket expenditures produce a larger recovery, class counsel would simply shortchange themselves by refusing to make those outlays. They are, after all, one of the means to a greater fee. The other means, of course, is attorney effort.

From the standpoint of the Lowey firm's bottom line, therefore, the impact of incurring an additional dollar in out-of-pocket expenses beyond the cap is exactly the same as the opportunity cost of devoting a dollar's worth of attorney billable time. The Gold firm's argument that the Lowey firm will be deterred by a reimbursement limitation amounts to a claim that the Lowey firm has a greater aversion to out-of-pocket litigation expenses than to an economically equivalent amount of attorney effort. This assumes that the Lowey firm suffers from the money illusion[8] and, irra-

---

**7.** The undersigned recognizes how lawyers sometimes use neutral appearing ethical rules to persuade courts to reach "extremely questionable" results. Compare: *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102 (5th Cir.1978) with J.

Macey and G. Miller, "The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation," 58 U.Chi.L.Rev. 1, 104 (1991).

**8.** Greater aversion to expenses denominated in money than to opportunity costs is called the

tionally, is less motivated to incur worthwhile out-of-pocket litigation expenses than to invest otherwise billable attorney hours in prosecution of this litigation.[9] Nothing suggests that the Lowey firm misperceives its own self-interest.

Yet another reason renders the Gold firm's ethical argument specious.[10] To varying degrees non-attorney litigation inputs are substitutes for attorney effort (e.g., computerized legal research, non-attorney factual investigation). If the costs of attorney substitutes are reimbursable one hundred cents on the dollar, a law firm paid by a percentage of recovery will find it in its interest to substitute non-attorney inputs for attorney effort. Allowing unlimited reimbursement of non-attorney inputs encourages greater such substitution. Reimbursable inputs which produce an additional dollar of recovery will cost the law firm nothing whereas an input of attorney effort which produces the same marginal recovery is compensated only by the percentage of the recovery representing the lawyer's fee. Reimbursement, thus, gives percentage fee lawyers an economic incentive to chose a combination of attorney and non-attorney litigation inputs which discourages attorney effort relative to other inputs, dubious stuff for canons of lawyer ethics.

But, still worse, full reimbursement of expenses encourages a form of cheating. The prospect of reimbursement tempts class counsel to allocate a portion of their overhead costs to specific litigation. Law office administration, secretarial, docket, word processing, accounting, library, clerical and other costs that must be incurred to enable the firm to operate at all can under some guise be allocated to the litigation at hand.[11] The possibilities for chiseling of this sort are bad enough in non-class litigation, but class litigation conducted by an ad hoc consortium of law firms set up for particular litigation is unusually vulnerable to such opportunism. J. Coffee, "Understanding the Plaintiff's Attorney," 86 Col. L.Rev. 669, 708–710 (1986). Far from elevating the ethics of class action practice, as the Gold firm contends, reimbursement of litigation expenses invites the opposite.

■ The Gold firm next argues that disclosing the bids for class counsel in the court's October 18, 1990 order, 132 F.R.D. 538, prejudiced the class. According to this argument, disclosure of the bids allowed defendants to obtain "valuable information about the Lowey firm's evaluation

money illusion or the endowment or framing effect. See, e.g., R. Thaler, "Toward a Positive Theory of Consumer Choice," 1 J. Econ. Behavior & Organ. 39 (1980); E. Kitch, "The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price?," 6 J. Law, Econ., & Organ. 217 (1990); R. Hasen, "Efficiency Under Informational Asymmetry: The Effect of Framing on Legal Rules," 38 U.C.L.A.L.Rev. 391, 424 (1990).

9. In one sense, this statement is incomplete. Full reimbursement allows percentage contingent lawyers to increase their fee at no cost to themselves, an obvious incentive to run-up expenses. After $325,000 of expenses are incurred, the Lowey firm's marginal fee becomes a fraction of each additional dollar of recovery. The Lowey firm's optimal level of expenditures will be less under a regime of partial reimbursement than if full reimbursement were permitted. This is a manifestation of the agency problem inherent in percentage contingent fees, 131 F.R.D. at 694, 132 F.R.D. at 544 et seq. But this can hardly be considered unethical. Attorney and non-attorney litigation inputs are to some degree substitutes for one another and partial or no reimbursement of non-attorney inputs corrects the anomaly created by full reimbursement of these inputs: attorney effort is discouraged relative to out-of-pocket expenditures.

10. The Gold firm fails to offer the one distinction which might justify treating litigation expenses differently from attorney effort: transactions costs. According to one observer, plaintiff firms depend on bank financing for litigation expenses. J. Coffee, "Understanding the Plaintiff's Attorney," 86 Col.L.Rev. 669, 706 (1986). Because arranging bank financing might entail transactions costs not encountered when attorney inputs are employed, some distinction may be appropriate, if it can be demonstrated. To the extent there is any differential here, however, it probably is captured in the Lowey firm's $325,000 reimbursement.

11. Even if class counsel suspects that obvious misallocations of overhead costs will be disallowed under a lodestar or other court review, these can be easily disguised. An expert witness or consultant can remit part of his fee to class counsel for "secretarial services," to name only one fairly obvious possibility.

of the case." Gold Mem. at 3. The Gold firm fails to identify any confidential or privileged matter, any investigatory report or any information in the bids which bears any earmark of confidentiality. Nor does the Gold firm mention the long-established law of this Circuit that attorney fees and expense agreements are not privileged. *Tornay v. United States*, 840 F.2d 1424, 1426–1428 (9th Cir.1988); *In re Michaelson*, 511 F.2d 882, 888–893 (9th Cir.1975).[12] Instead, the Gold firm contends that knowledge of the Lowey firm's "inadequate fee structure and the 'cap' on reimbursable costs" gives defendants "particularly powerful motives to delay and out-spend plaintiffs" and thereby "squeeze the Lowey firm by simply postponing the day of reckoning." Gold Mem. at 15. Thus squeezed, the Lowey firm presumably would be willing to take less than the true value of the class' claim.

In truth, one cannot reasonably divine the Lowey firm's valuation of this litigation from its bid. But even assuming *arguendo* that it is possible to do so by shrewdly reading between the lines of that firm's bid, the class is not harmed. If it were otherwise, one could with the logic of the Gold firm argue that complaints ought not to contain prayers or parties ought not to make settlement demands lest the lawyer's evaluation of the case be disclosed.

In common fund class litigation, disclosure of class counsel's compensation arrangements benefits the class, if not class counsel, by producing information highly pertinent to class counsel's performance. The compensation of an attorney who seeks to represent a class in common fund litigation is inevitably contingent regardless whether class counsel is paid by the hourly-based lodestar method, a benchmark percentage of the recovery or otherwise. Class counsel's compensation is contingent because without recovery, counsel receives nothing. In offering attorney services on a contingent fee basis, lawyers are in reality purchasing an equity interest in the claim. G. Miller, "Some Agency Problems in Settlement," 16 J. Legal Stud. 189 (1987). Unlike the usual attorney-client situation, however, class members do not participate in the negotiations by which a part of their claim is bargained away.

The lodestar and benchmark approaches allow the consortium of plaintiff lawyers who file class litigation to select one of their number to serve as lead counsel and thereby to control the attorney fee application and dole out the work on the case to the various attorneys who have filed complaints.[13] This process unfolds with no oversight by the court until after the litigation has run its course. Class counsel's conduct of the litigation is thus not exposed until a settlement or other disposition has been reached. Class counsel's fee application is presented to the court with the enthusiastic endorsement, or at least acquiescence, of the lawyers on both sides of the litigation, a situation virtually designed to conceal any problems with the settlement not in the interests of the lawyers to disclose. This violates at least the spirit of ABA Model Rule 1.5(b) which requires communication of the "basis or rate of the fee * * * before or within a reasonable time after commencing the representation." Such communication is simply impossible under the lawyer-controlled lodestar or benchmark methods since the issue of fees remains unsettled until the end of the case. The dilemma this creates is plain.

The central and long recognized problem in class litigation arises from the inability of the persons whose rights are at stake to monitor the faithfulness of their self-appointed champion and the dubious ability of the court effectively to do so on behalf of the class. Class counsel's evaluation of the case, if implicit in a competitive bid made at

---

12. Cf: Cal.Bus. & Prof.Code, § 6129, an enactment of dubious value to clients; see, L. Brickman, "Contingent Fees Without Contingencies," 37 U.C.L.A.L.Rev. 29 (1989).

13. The flurry of complaints filed by various lawyers which signals the start of most securities class actions suggests that search costs for plaintiff lawyers are negligible and pre-filing investigation minimal. J. Alexander, "Do the Merits Matter? A Study of Settlements in Securities Class Actions," 43 Stan.L.Rev. 497, 513–514 (1991).

the outset of litigation, may well provide the best yardstick to measure class counsel's ultimate performance. Because the "effectiveness of monitoring depends on the observability of the agent's performance," J. Macey and G. Miller, "The Plaintiff's Attorney's Role in Class Action and Derivative Litigation," 58 U.Chi.L.Rev. 1, 13 (1991), addition of a highly fact-specific measure of class counsel's performance can only aid the court, and thereby the class, in the crucial decision whether to approve and accept a settlement proposal put forward by class counsel. As the Gold firm's arguments suggest, lawyers dealing in class actions undoubtedly would prefer to keep their initial assessments of litigation under wraps. This avoids the need for potentially embarrassing explanations when results obtained fall short of those implicit in an evaluation of the case at its outset, but this can hardly be in the interest of the class.[14]

The Gold firm's suggestion that defendants will use knowledge of class counsel's bid as a pretext to wage a mother of all litigation proceeds from the dubious premise that defendants control the costs of securities class action litigation. J. Alexander, "Do the Merits Matter?: A Study of Settlements in Securities Class Actions", 43 Stan.L.Rev. 497, 548 (1991). Because defendants can only do battle at a cost commensurate with its scale, the argument assumes that both sides in class litigation are trapped in a kind of prisoner's dilemma that causes rational behavior to break down. See N. Fraser and K. Hipel, Conflict Analysis: Models and Resolutions at 247–250 (1984). Of course, no one knows for sure the dynamics of litigation, but the fact remains that a lodestar method of compensating class counsel affords them no incentive to resist defendants' usual delaying tactics. Indeed, the more hours class counsel can with some justification devote to the litigation, the more impressive will be the fee application ultimately submitted to the court for approval.[15] The result is that as defendants delay the ultimate resolution of litigation, the class' share of the ultimate recovery will diminish relative to that of class counsel. Such an incentive structure insulates class counsel—but not the class—from the adverse effect of defendants' delaying tactics, a circumstance which does not encourage class counsel's faithfulness to the class' interests.

Under the lodestar, the impact of dilatory maneuvers by defendants on the class is twofold: first, the class' recovery, if any, is delayed; second, the class' recovery is diminished by the additional amounts paid class counsel to fend off the delays.[16] If, however, class counsel's compensation is only partly augmented by the length of the litigation, a distinctive feature of the Lowey bid, 132 F.R.D. at 544–548, class counsel's incentives to resist defendants' delaying tactics are correspondingly increased and class counsel's interests more aligned with that of the class. Class counsel are given an incentive to resist dilatory tactics of defendants by seeking appropriate protective orders, discovery limitations or other restrictions. To the extent that class

---

**14.** In seeking designation as class counsel, attorneys commit a portion of their "stock in trade" (time and effort) to the litigation. The ex post fee determinations of the lodestar and benchmark constitute a "pay me what you think it's worth" offer by class counsel for their services. One suspects that such arrangements would not be acceptable to the shrewd and aggressive lawyers who do class action work if the class were beneficiary.

**15.** The Gold firm's argument is also eviscerated by the allowance of prejudgment interest at defendants' cost of funds which greatly reduces, if not eliminates, the incentive for defendants to engage in a battle of litigation costs, 132 F.R.D. 538, 547; *Gorenstein Enterprises, Inc. v. Quality*

Care–USA, Inc., 874 F.2d 431, 436 (7th Cir.1989), *disagreed with on other grounds, Business Guides, Inc. v. Chromatic Communication Enterprises, Inc.,* 892 F.2d 802 (9th Cir.1989), affirmed, ── U.S. ──, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

**16.** The benchmark percentage approach advocated by some judges, e.g., *In re Activision Securities Litigation,* 723 F.Supp. 1373 (N.D.Cal. 1989), does not avoid the problem which the Gold firm ascribes to disclosure of competitive bids because a defendant could readily figure out from the benchmark what "evaluation" of the case class counsel must have made to justify bringing the particular litigation.

counsel can establish that defendants' delaying tactics could not reasonably be foreseen and thus accounted for in the bid, class counsel have established a compelling basis for court orders limiting such defense tactics.[17] Disclosure of class counsel's compensation arrangements thus facilitates, rather than impedes, corrective measures to defendants' all too familiar tactic of foot-dragging.

Disclosure of class counsel's compensation arrangements also impedes defendants' ability to cut a sell-out settlement with class counsel. See A. Rosenfield, "An Empirical Test of Class Action Settlement," 5 J.Legal Stud. 113 (1976). The absence of disclosure gives class counsel an opportunity to collude with defendants and a free hand to rationalize whatever settlement or other disposition that alliance may produce. No doubt the shuttering of this window of opportunism accounts for the uniformly unenthusiastic response of lawyers on both sides of this litigation to competitive selection of class counsel.[18]

Disclosure of the competing bids for class counsel is consistent with the Federal Rules. A contingent attorney fee agreement allows the client to shift a portion of the risk of losing the litigation to the attorney, K. Clermont and J. Currivan, "Improving on the Contingent Fee," 63 Cornell L.Rev. 529, 547 (1978), while a securities class action functions as market insurance against loss from a market decline. J. Alexander, 43 Stan.L.Rev. at 570. The terms for compensation of class counsel

are thus analogous to parties' insurance coverage which is clearly, and quite sensibly, discoverable under Fed.R.Civ.P. 26(b).

As sort of a final grievance, the Gold firm complains that it never expected that its bid would be disclosed. This, of course, overlooks that passage of the August 3 order which described the advantages of a competitively bid fee as including "increased ability on the part of counsel, the parties, and the court during litigation to forecast one (perhaps the most) important variable for purposes of strategy, settlement and the like." 131 F.R.D. at 695.[19] Plainly this advantage could not be realized if the successful bid remained hidden in some clerk's drawer pending resolution of the litigation.[20]

## II. QUALIFICATIONS FOR CLASS COUNSEL.

The infirmity of the Gold firm's attack should not suggest that competitive selection of class counsel is free of difficulty. Like other contractual relationships in which contracting is temporally separated from performance (e.g., insurance, franchise agreements), competitive selection possesses a potential for adverse selection. This occurs because a bid for class counsel must of necessity be based on incomplete information. Unanticipated circumstances may alter the potential profitability of the bid and hence the incentives for class counsel's performance. A firm which is unduly optimistic about the cost of prosecuting a class action may underbid a firm which makes a more realistic assessment. If the

---

**17.** Alternatively, class counsel might also by such showing establish a basis to adjust its bid. See, 650–651, infra.

**18.** This may also explain the suggestion of one of defendants' counsel here that a master, magistrate or a judge not familiar with the litigation supervise bidding for class counsel designation. The Third Circuit Task Force mentioned this possibility, but recognized its problems ("unduly expensive" and raising problems of "patronage and discrimination"). Ultimate resolution of these problems inevitably falls to the assigned judge. 108 F.R.D. 237, 257. Significantly, the economic interests of defendants' counsel, who are typically compensated by the hour, are served by adding an additional layer of review whether by magistrate, master or other judge. 131 F.R.D. at 692 n. 9.

**19.** At the March 20 hearing, the Gold firm's Paul Bennett admitted that his firm's joint proposal with the Berger firm contained nothing confidential. The Gold firm wholly fails to identify what "confidential" matter appeared in its competitive bid that was not also discussed in the Berger–Gold joint proposal.

**20.** The Gold bid's built-in incentive for a sell-out settlement was a sufficient reason for its rejection, a point that has been adequately explained earlier. See 132 F.R.D. at 544–546. A readable discussion of settlement problems in litigation generally is found in G. Miller, "Some Agency Problems in Settlement," 16 J.Legal Stud. 189 (1987).

unduly optimistic firm is selected and later discovers that it cannot carry out its obligations profitably, it might perform poorly or not at all.[21]

Selection of class counsel *solely* on the basis of price,[22] without consideration of qualitative factors and possible penalties for poor performance, may create an incentive for "lemon" lawyers to drive out the good ones from the bidding process. As to this problem generally, see G. Akerlof, "The Market for Lemons: Qualitative Uncertainty and the Market Mechanism," 84 Qtrly.J.Econ. 488 (1970). A court must evaluate the quality of a competitive bid at the time of bidding and thereafter monitor class counsel's performance *during* the litigation. This requires consideration of the sanctions appropriate for a breach by class counsel and the possibility for renegotiation of class counsel's bid or the replacement of class counsel, if necessary. D. Spulber, "Auctions and Contract Enforcement," 6 J.Law, Econ., & Organ. 325 (1990).

Far from eliminating the potential for adverse selection, the lodestar and benchmark approaches magnify it for at least two reasons: (1) the "uncertain game of assessing fees under the lodestar calculation," and to a lesser degree, the benchmark approach, J. Macey and G. Miller, 58 U.Chi.L.Rev. at 48–61, discourages well qualified but risk-averse lawyers from class action practice; (2) monitoring of class counsel's performance is impeded by restricting judicial review to class counsel's fee application. Under the lodestar and benchmark, the plaintiff steering committee largely screens poor lawyering from judicial view, resulting in recoveries whose inadequacies courts cannot or will not ferret out. Courts which satisfy themselves that their ability to adjust class counsel's compensation gives sufficient incentive for quality performance by class counsel typically fail to require meaningful qualitative information from those seeking to represent a class. This longstanding practice undoubtedly explains the jejune recitations of their qualifications furnished by the four bidders here. 132 F.R.D. at 542.

As statistics for quality lawyering, the pufferies of past recoveries and "judicial bouquets" in the bids here are the equivalent of an old school tie or the right accent. To be sure, exceedingly subjective credentials are not meaningless. See G. Akerlof, "The Market for Lemons: Qualitative Uncertainty and the Market Mechanism," 84 Qtrly.J.Econ. at 494–495. But bland acceptance of such credentials falls short of the fiduciary standards demanded of courts by Rule 23. The lodestar and benchmark approaches fail largely because they abdicate responsibility for controlling the quality and identity of the lawyers who represent the class to the lawyers themselves. By the time courts get around to evaluating the lawyers' conduct, they have already performed well, poorly or indifferently and the judge has no incentive to make serious inquiry.

Yet standards for class counsel's performance are neither elusive nor foreign to the judiciary. Indeed, the setting of such standards is far more congenial to judicial decision-making than the fee setting exercise demanded by the lodestar and benchmark. Quality standards might consist, among other things, of all or any of the following: (1) evidence that one who proposes to serve as class counsel has evaluated the case, the range and probability of recovery and has premised the bid on that evaluation; (2) evidence of an ability and willingness to see the case through to recovery, such as posting a completion bond or escrowing an amount that would be forfeited in the event class counsel fails to

---

21. Alone among the lawyers in this litigation, Elizabeth Joan Cabraser, one of the derivative counsel, has recognized the potentiality for competitive bidding to lead to a race to the bottom. Mem.Derivative Pls., April 22, 1991. Ms. Cabraser thoughtfully suggests a "change order" procedure for dealing with the problem.

22. Contrary to otherwise thoughtful commentary, the Lowey bid was not selected *"solely* on the basis of price." J. Alexander, 43 Stan.L.Rev. at 589 (emphasis added). For recoveries within 12 months below $1.6M and after 12 months below $12M, the Abbey bid was lower than the Lowey bid; the structure of the latter bid was superior. 132 F.R.D. at 543, 547.

perform; (3) evidence of a willingness and financial ability to guarantee a minimal level of recovery for the class; (4) evidence of financial resources or insurance coverage adequate to compensate the class in the event of malpractice. These are but four possible measures of quality. Undoubtedly, the able and aggressive lawyers who practice in this field will, if driven by competitive necessity, come up with workable proposals along these lines and devise many other ways to assure courts of the quality of the services to be performed.

In order to ensure the class receives high quality representation, courts must consider sanctions or penalties for failure to perform. Fortunately, in this setting, adverse reputational effects of a failure to perform or substandard performance furnish considerable sanction. The effectiveness of this sanction, however, requires that it can be used. By their nature, the lodestar and benchmark do not entail review of class counsel's performance until the end of the litigation when courts, typically, are delighted to clear their dockets and thus inclined to cursory and forgiving review of class counsel's performance. This undoubtedly accounts for the plethora of laudatory remarks about class counsel in fee orders and the paucity of other observations. Any shortcomings of competitively selected class counsel that would necessitate judicial action during the litigation, on the other hand, are likely to bestir blistering commentary from the bench. The effectiveness of reputation as a sanction should be commensurately increased.

Competitive selection, by breaking up the lawyer consortiums identified with the lodestar, should also increase the effectiveness of monitoring because—professional courtesies, aside—the disappointed bidders are likely to be on the lookout for shortcomings in the performance of the winner. In extreme cases, the disappointed bidder might bring a malpractice class action against a winning, but bungling, bidder.

Competitive selection does not make price supreme and determinative, but forces the lawyers and courts to deal with the *quality* of class counsel's services. The possibility that a lower bid might appear more attractive invites a bidding firm to lay out its qualitative advantages to increase its bid's chances of acceptance. Of course, the Lowey firm's bid came nowhere near establishing meaningful quality standards the court would expect in future competitive selections. The court is, nonetheless, satisfied that the Lowey firm is adequately qualified to represent a class of Oracle shareholders. This conclusion is based on the court's observations of the Lowey firm's performance since its selection as class counsel.[23] Equally important, the Lowey firm's bid is generally consistent with the pattern and level of compensation found suitable in class litigation. The court previously noted two features of class counsel fees that would emerge from a "process [that] most closely approximates the way class members themselves would make these decisions," 131 F.R.D. at 690, about class counsel fees and costs:

1. The ratio of fees and expenses to recovery should decline as recovery increases; and

2. The ratio of fees and expenses to recovery should increase as the amount of attorney effort necessary to produce the recovery increases.

131 F.R.D. at 543–547.

These relationships have been confirmed by recently published results of a survey of 404 securities and antitrust class action attorney fees and costs awards over a ten year period from 1980 to 1990. 13 Class Action Rpts. 249 (July–Oct. 1990). The sample contained 334 securities cases; in

---

**23.** Promptly after its selection, the Lowey firm filed a comprehensive consolidated complaint which defendants answered without the usual time-consuming motion practice. A pretrial order tentatively certifying a class was worked out and approved by the court. Discovery, including third party discovery involving Arthur Andersen, is well underway. The Lowey firm's papers have been thoughtful and to the point. Moreover, the Gold firm's post-bid sniping seems not to have deflected the Lowey firm from its undertaking.

283 of them data on class counsel hours were available. The securities case survey results taken from 13 Class Action Rpts. at 546 (1990) are set forth in the table:

| RECOVERY | NO. OF CASES[24] | AGGREGATE RECOVERY ($M) | FEES & COSTS (%) | ATTORNEY HOURS | MULTIPLIER | CURRENT HOURLY RATE |
|---|---|---|---|---|---|---|
| ≤$50M | 12(12) | 2,299.0 | 8.2 | 336,343 | 1.78 | 463.59 |
| $20<$50M | 22(20) | 692.2 | 17.8 | 266,400 | 2.45 | 464.76 |
| $10<$20M | 41(34) | 574.8 | 25.9 | 364,061 | 1.75 | 353.95 |
| $5<$10M | 49(43) | 335.0 | 25.8 | 277,230 | 1.53 | 319.90 |
| $3<$5M | 52(48) | 202.7 | 28.6 | 214,191 | 1.55 | 303.22 |
| $2<$3M | 31(25) | 72.4 | 25.2 | 65,165 | 1.33 | 291.60 |
| $1<$2M | 48(37) | 65.7 | 28.3 | 83,702 | 1.14 | 227.60 |
| <$1M | 79(64) | 39.5 | 27.2 | 84,550 | 0.89 | 170.52 |
| TOTAL/ MEAN | 334(283) | 4,281.4 | 15.2 | 1,691.642 | 1.72 | 363.38 |

These results are consistent with the theoretical analysis of A. Rosenfield, "An Empirical Test of Class Action Settlement," 5 J.Legal Stud. 113 (1976) and regressions performed on 94 older (i.e., 1958 to 1979) securities and antitrust class actions. See W. Lynk, "The Courts and the Market: An Economic Analysis of Contingent Fees in Class Action Litigation," 19 J. Legal Stud. 247 (1990).

These results demonstrate the sumptuousness of the Gold and Berger bids and lay to rest the Gold firm's assertion that the Lowey bid would afford an "inadequate fee." [25] Gold Mem. at 26. At recoveries under $1M and over $50M, the Lowey bid exceeds typical lodestar awards, while at ranges between these extremes, the Lowey bid generates remarkably similar fees and costs. Similarity between competitive bids and the pattern of lodestar awards, however, does not endorse a single lodestar award. At most, these results may be consistent with the hypothesis that judicial fee awards afford proper incentives for the amount of class litigation brought on average. W. Lynk, 19 J.Legal Stud. at 259–260. But the results dash the benchmark approach's underlying assumption of a standard percentage class counsel fee. *Id.*

at 259 n. 23. Contra: *In re Activision Securities Litigation*, 723 F.Supp. at 1377 (N.D.Cal.1989).

### III. ACCOMMODATING CHANGED CIRCUMSTANCES.

The unarticulated reason for insistence that courts using the benchmark should leave room for "upwards" and "downwards" adjustments is that one percentage fee does not fit all cases. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989). Any litigation will look different in hindsight than at the outset. 131 F.R.D. at 692–693. But this does not warrant leaving the establishment of class counsel's terms of engagement to the end of the case. Quite the opposite, courts should establish the terms up front, subject to possible sanctions or adjustment placed openly on the public record. The events surrounding the addition of Arthur Andersen and Oracle's March 26 release illustrate the point.

At the time this litigation commenced, none of the plaintiff lawyers evidently thought to sue Arthur Andersen or, at any rate, considered it worth doing. Possibly, there was then no evidence suggesting Arthur Andersen's liability. Perhaps, also,

---

**24.** Parenthetical numbers are cases in which attorney hours data were available.

**25.** These results also suggest the absence of material difference between the lodestar and benchmark. Compare: *Matter of Superior Beverage/Glass Container*, 133 F.R.D. 119 (N.D.Ill. 1990) with *In re Activision Securities Litigation*, 723 F.Supp. 1373 (N.D.Cal.1989). Predictably, given the rudderless standards of the lodestar, *Johnson v. Georgia Highway Express Inc.*, 488

F.2d 714 (5th Cir.1974), lodestar courts appear to adjust the multiplier upwards or downwards (as well as to cut hours) to obtain an award which is a percentage of the recovery perceived to be "fair." 131 F.R.D. at 694–697. This is precisely the palliative that has been recommended to prevent windfalls under the benchmark approach, *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989).

the lawyers were influenced by the knowledge and experience that accounting firms are notoriously tough adversaries in securities litigation. As repeat players in the business, such firms are constant targets of securities claims. J. Alexander, 43 Stan. L.Rev. at 533–534. Experienced plaintiff securities lawyers do not undertake litigation against such a defendant lightly. *Ibid.* Whatever the reasons for not suing Arthur Andersen at the outset, plaintiffs and the court find themselves about a year into the litigation now facing the addition of a significant new defendant. Contrary to the Gold firm's suggestion that this should occasion scrapping the Lowey bid and competitive selection, the court and counsel can (and, indeed, must) evaluate with much greater effectiveness the possible consequences of adding Arthur Andersen.

Unlike the lodestar or benchmark which allow class counsel to make up their case as they go along, competitive selection by its nature forces firms bidding for class counsel to define their claims at the outset. The claims must at least have sufficient definition to enable a bidder to get a handle on the costs of the litigation and its potential rewards. As a result, the Lowey firm will have some advantage in bidding to represent a class against Arthur Andersen: knowledge of the facts and obvious scale economics. Still, the Gold firm or one of the others may be anxious enough to have some role in this litigation that they will submit more attractive bids.

At present, the Lowey and Gold firms take somewhat different views of the appropriate claims to assert against Arthur Andersen. The Gold firm would assert claims based on Oracle's fiscal 1989 audited financial statements as well as the fiscal 1990 audited statements while the Lowey firm would accuse only the latter. In evaluating competitive bids, the court might have to consider the effect of these differing litigation positions. It is clear, however, that designations of class counsel should relate in the first instance to the defendant being sued. A lawyer representing a class against a particular defendant has every incentive to seek the greatest possible recovery and can be expected to broaden the class definition and period to the maximum reasonable under the circumstances.

Because the Lowey firm is unwilling to add Arthur Andersen under the terms of its present bid, it will be required to make any discovery obtained in the litigation which relates to Arthur Andersen available to any firm notifying the court and the Lowey firm of an intent to bid on representing a class against Arthur Andersen. To ensure the class receives a competitive fee, 131 F.R.D. at 693, the court will chose and compensate only *one* law firm to represent a class of Oracle shareholders against Arthur Andersen and any other new defendant.[26]

Finally, the court is not unmindful that most of the lawyers in this litigation who have expressed themselves prefer some means other than competitive selection of class counsel. A judge's oath does not include the happiness of lawyers. Some may be put off by the somewhat commercial ring of competitive selection, thinking it ill suits a learned profession. See, e.g., *Rand v. Monsanto Co.,* 926 F.2d 596, 603 (7th Cir.1991) (concurring). The prevalence of competitive selection of contractors for public endeavors more compelling than securities class actions should allay these concerns. Under Rule 23, courts owe class members more than the right price for the services of class counsel. Courts possess a fiduciary duty, "something stricter than the morals of the marketplace." *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928). By focusing inquiry on the expectations, practices and standards of class counsel, competitive selection better discharges this duty and more suits judicial decision-making than merely dictating class counsel's compensation.

Accordingly, IT IS ORDERED that:

---

**26.** In addition to setting the stage for competitive selection, designation of *one* firm as class counsel has other advantages. Not least among these is discouraging one of co-counsel to free ride off the efforts of co-counsel by attacking a proposed settlement as a means of extracting a larger share of the fee award.

1. The motions for reconsideration of the court's prior orders are DENIED and the Lowey firm's engagement as class counsel against the defendants named in the amended and supplemental consolidated class action complaint in accordance with the court's October 18, 1990 order, 132 F.R.D. 538, is CONFIRMED;

2. Except for the claims asserted in the amended and supplemental consolidated class action complaint filed December 19, 1990, all related proceedings purporting to assert class claims are until further order STAYED;

3. A status conference is scheduled for June 13, 1991 at 10:00 a.m., and, after conferring with counsel, the court will entertain bids to serve as class counsel in class proceedings against Arthur Andersen & Co.

4. The proceedings in *Greg Cronin, et al. v. Arthur Andersen & Co.*, No. 91–0945 VRW, and all other purported class actions on behalf of Oracle shareholders against Arthur Andersen & Co. which are related under L.R. 205–2 are consolidated for further proceedings pursuant to Fed.R.Civ.P. 42(a).