

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-2001

# In Re: Cendant Corp.

Precedential or Non-Precedential:

Docket 99-5485

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation
"In Re: Cendant Corp." (2001). *2001 Decisions*. Paper 176.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/176

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 8, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5485

IN RE: CENDANT CORP., (formerly known as CUC
International, Inc.) CENDANT CAPITAL I

LESTER A. GOLDSTEIN, on behalf of himself and all
others similarly situated; WELCH & FORBES INC., an
institutional investment manager, individually and on
behalf of all others similarly situated

v.

WALTER A. FORBES; COSMO CORIGLIANO; ANNE M.
PEMBER; MERRILL LYNCH & CO.; CHASE SECURITIES
INC.; HENRY R. SILVERMAN

v.

ERNST & YOUNG; CENDANT MEMBERSHIP SERVICES,
INC.; CASPER SABATINO; STEVEN P. SPEAKS; KEVIN T.
KEARNEY; MARY SATTLER;

HOWARD SIROTA,
        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

District Judge William H. Walls
(D.C. Civ. No: 98-01664)

Argued December 15, 2000

Before: SCIRICA, FUENTES, and GARTH, Circuit  Judges

(Opinion Filed: August 8, 2001)

　　　　　Adam N. Saravay (argued)
　　　　　Tompkins, McGuire, Wachenfeld &
　　　　　 Barry, LLP
　　　　　Four Gateway Center
　　　　　100 Mulberry Street
　　　　　Newark, New Jersey 07102

　　　　　 Attorneys for Appellant

　　　　　Judith E. Harris (argued)
　　　　　Morgan, Lewis & Bockius, LLP
　　　　　1701 Market Street
　　　　　Philadelphia, Pennsylvania 19103

　　　　　 Amicus Curiae in support of the
　　　　　Order of the District Court

OPINION OF THE COURT

FUENTES, Circuit Judge.

This appeal raises important questions concerning the use of sealed bids in auctions conducted to select lead counsel in class action lawsuits. The genesis of the appeal lies in the District Court's selection of lead counsel in the Cendant "PRIDES" securities litigation based on the results of a competitive bidding process. The core of the dispute involves a confidentiality order in which the District Court decided to seal the bids until resolution of the case. The order was issued in connection with an in camera hearing where plaintiffs' attorneys, but not the general public, had access to the bids. After learning that one of the unsuccessful bidding attorneys, Howard Sirota, had spoken to a reporter from the New York Times about the bidding process, the District Court fined Sirota $1,000. Sirota appeals the sanction. Because we conclude that the District Court failed to articulate the necessary findings for the issuance of the confidentiality order, and because we find that, in any case, Sirota did not violate the order, we will vacate the sanction.[1]

_____

1. The Court takes this opportunity to express its appreciation to Judith E. Harris and the law firm of Morgan, Lewis & Bockius LLP, for arguing as amicus in support of the District Court's order in this case.

I.

Some explanation of the underlying securities litigation provides a helpful background for the proceeding resulting in the sanction against Sirota. Because a full procedural and factual background of the Cendant litigation is set forth in numerous published opinions,[2] we will only discuss the facts most relevant to the resolution of the issues presented in this appeal. Briefly, on April 15, 1998, Cendant Corporation announced that it had uncovered substantial accounting irregularities and would have to restate reported annual and quarterly earnings for 1997 and possibly earlier; as a result, Cendant stock plummeted 46%. Some 64 lawsuits (mostly class actions) were filed against Cendant, its officers and directors; all but one were consolidated.

On May 29, 1998, a preliminary case management/ scheduling order established a schedule for motions to address the appointment of lead counsel for the class. Among the fifteen motions filed was one submitted by Sirota, together with co-counsel John J. Barry and Charles C. Carella, to have their clients, the Joanne A. Aboff Family Trust ("Aboff ") and Douglass Wilson, appointed as lead plaintiffs and to have themselves appointed lead counsel.

After considering the motions, the District Court outlined a process for selecting lead plaintiff and lead counsel. First, the District Court applied a statutory presumption that the plaintiff with the largest financial interest in the litigation should be appointed lead plaintiff. See In re Cendant Corp. Litig., 182 F.R.D. 144, 146–47 (D.N.J. 1998) (citing 15 U.S.C. S 77z–1(a)(3)(B)). Because of a possible conflict of

_____

2. The District Court has authored several opinions. See, e.g., In re Cendant Corp. Litig., 182 F.R.D. 144 (D.N.J. 1998); In re Cendant Corp. Prides Litig., 51 F. Supp. 2d 537 (D.N.J. 1999), vacated in part, 243 F.3d 722 (3d Cir. 2001); In re Cendant Corp. Prides Litig., 189 F.R.D. 321 (D.N.J. 1999), aff 'd, 233 F.3d 188 (3d Cir. 2000). The Cendant cases have also spawned a number of appeals to our Court. See, e.g., In re Cendant Corp. PRIDES Litig., 243 F.3d 722 (3d Cir. 2001); In re Cendant Corp. PRIDES Litig., 235 F.3d 176 (3d Cir. 2000); In re Cendant Corp. PRIDES Litig., 234 F.3d 166 (3d Cir. 2000); In re Cendant Corp. Prides Litig., 233 F.3d 188 (3d Cir. 2000).

interest, the District Court determined that a separate lead plaintiff would be appointed to pursue claims involving Income and Growth Prides ("PRIDES"), derivative securities based on Cendant common stock.[3] See id. at 149-50. Neither Aboff nor Wilson was selected as a lead plaintiff.

Second, in selecting lead counsel, the District Court adopted a competitive bidding system, reasoning that "the most effective way to establish reasonable attorney fees is through marketplace . . . competition." Id. at 150. The District Court therefore ordered "an auction to determine the lowest qualified bidder to represent the class as counsel." Id. at 151. To be considered, plaintiffs' attorneys were required to submit bids under seal, stating, among other things, their professional qualifications and the fee arrangement that would be acceptable to them should they be selected as lead counsel. The record as of this date reveals that all bids remain under seal.

On October 2, 1998, the District Court selected separate lead counsel for the non-PRIDES claims and for the PRIDES claims; Sirota and his co-counsel were not selected. In choosing lead counsel, the District Court stressed the need for confidentiality. Following an in camera hearing, attended only by applicants for the two lead counsel positions, i.e., plaintiffs' attorneys, the court distributed an opinion containing a confidentiality order. The court ordered the identities of the bidders and the nature of their proposals sealed until the conclusion of the case, referring to the proposals only by number and explaining:

> It is of utmost concern to the Court that this opinion, the bidders' identities and the contents of their bids be sealed until resolution of this matter. This is done to maintain adversarial integrity, that of strategy and tactics, which is the prerogative of all parties, plaintiffs and defendants.

_____

3. The non-PRIDES claims included those of former shareholders of CUC International and HFS, Inc., companies which merged to form Cendant, as well as the claims of purchasers of Cendant stock. See Cendant, 182 F.R.D. at 146.

4

In re Cendant Corp. Litig., 191 F.R.D. 387, 387 (D.N.J. 1998) (opinion selecting lead counsel). As a result of the in camera hearing and the confidentiality order, plaintiffs' attorneys, but not the general public, had access to each others' bids.

Thereafter, on November 30, 1998, the District Court separated the PRIDES claims from the rest of the Cendant case. In an order entered on March 18, 1999, the District Court preliminarily approved a proposed settlement of the PRIDES case presented by lead counsel and Cendant. The proposed settlement provided that, in return for dismissal and release of all claims, Cendant would confer upon each class member who opted in, one "Right" worth $11.71 for each PRIDES held at the close of business on April 15, 1998, giving the settlement an aggregate theoretical value of $341.5 million. The March 18, 1999 order also approved the "form and content" of notice to be distributed to class members regarding the settlement. That notice stated that lead counsel would apply for attorneys' fees, to be paid in Rights, in an amount not to exceed 10% of the $341.5 million theoretical value of the settlement. To this effect, the notice contained the following assurance:

> You also should know that the lead counsel appointment process included a court-mandated bidding process. This was intended to assure that the largest possible portion of any recovery remained with participating class members, or conversely that qualified lead counsel took the least possible sums from the benefits to be obtained by participating class members. In Lead Counsel's view, under the fee mechanism proposed by Lead Counsel and described herein, there is a substantial likelihood that a substantial part, if not all, of the fees sought will be obtained from Unclaimed Rights and Opt Out Rights. As a consequence, in Lead Counsel's view, those Class Members who become Authorized Claimants will not have to pay any of Lead Counsel's fees, or if they do, there is a substantial likelihood that it will be less than the amount otherwise payable under the bids approved by the Court in the process of appointing lead counsel.

5

In re Cendant Corp. Prides Litig., No. 98-2819, slip op. at ___ (D.N.J. Mar. 18, 1999) (emphasis added) (order regarding proposed class action settlement, settlement hearing and notice of proposed settlement).

Besides preliminary approval and notice, the order of March 18, 1999 also provided that any class member wishing to object to the settlement or to the lead counsel's fee application should file written objections with the District Court. On May 4, 1999, Sirota, along with co-counsel, filed objections on behalf of Aboff to the proposed settlement and to lead counsel's application for fees. In particular, the brief submitted by Sirota argued that "the $34 million fee Lead Counsel seeks far exceeds the fee Lead Counsel agreed to accept [in the bidding auction]."

On May 14, 1999, the New York Times published an article stating, "Mr. Sirota calculates that the value of [lead counsel's proposed fee] would be $34 million, and argues that it would thus be about 10 percent of the total settlement fund a percentage he contends greatly exceeds the confidential bid that [lead counsel] submitted to the court last year." Diana B. Henriques, Lawyers Handling Litigation Against Cendant Propose an Innovative Way to Pay Their Fees, N.Y. Times, May 14, 1999, at C7. Seeing this article, the District Court issued an order"to show cause why [Sirota] should not be held in contempt and sanctioned for violations of this Court's confidentiality order of October 2, 1998."4

_____

4. In its entirety, the order provided:

The Court brings this matter on its own initiative for Howard B. Sirota to be ordered to show cause why he should not be held in contempt and sanctioned for violations of this Court's confidentiality order of October 2, 1998 as reported in the New York Times on May 14, 1999 ("Mr. Sirota calculates that the value of that compensation [Kirby's proposed fee] would be $34 million, and argues that it would thus be about 10 percent of the total settlement fund--a percentage he contends greatly exceeds the confidential bid that the Kirby firm submitted to the court last year.").

It is on this 17th day of May, 1999:

ORDERED that Mr. Sirota appear before this Court on the 19th day of May, 1999 at 10:00 a.m. to show cause why he has not violated this Court's confidentiality order of October 2, 1998 and why he should not be held in contempt and sanctioned.

6

On May 19, 1999, the District Court held a hearing on the order to show cause, focusing on whether Sirota's apparent statement to the New York Times concerning lead counsel's bid violated the October 2, 1998 confidentiality order. Defending himself, Sirota explained that: (1) he had no intention to violate the confidentiality order; (2) he had simply told a reporter from the New York Times that he had filed an objection with the District Court; (3) he did not make any substantive comments to the reporter; (4) the newspaper article merely referred to arguments made in his written objection of May 4, 1999; and (5) Sirota believed that the relative comparisons made in the written objection had been authorized by the District Court's March 18, 1999 order. As to the last point, Sirota noted that the March 18, 1999 order which preliminarily approved the settlement of the PRIDES case, also approved a form of notice stating lead counsel's belief that the attorneys' fees would be less than provided for by the bidding process. Thus, Sirota argued that it was reasonable for him to believe that the confidentiality order did not prohibit him from responding to lead counsel's contention that the proposed fee was less than the bid by arguing that it was actually more than the bid:

> [Because of the notice], the defendants and everyone else knew the relative magnitude of the fee sought and that according to [lead counsel] it was not more than the bid. The rationale of keeping the defendants from knowing the amount of the compensation of their adversary, I thought, was over as reflected in the Court authorized notice and reflected in [lead counsel's] understanding that one could make claims. [Lead counsel] made the claim in the notice . . . . The Court invited objections in the notice and we came and said truthfully he is asking for more than his bid.

Thereafter, the District Court stated that it had"no problem" with Sirota making this argument in court, but that speaking to the press was different.

At the conclusion of the hearing, the District Court determined that finding Sirota in contempt was unwarranted. Nevertheless, relying on Local Civil Rule 101.1 and on its inherent power to discipline attorneys, the

7

District Court imposed sanctions on Sirota for violating the confidentiality order. The District Court explained:

> Why am I doing that? Because having you yourself admitted to twenty years before a bar if not the New Jersey bar, I hold you to that of a reasonable attorney who, when confronted with a specific order of confidentiality, a specific order of confidentiality before he would broach the subject to a third party such as the press, whether generally or specifically, he should have, in good conscience or in good professionalism at least made contact with the Court to insure that whatever he said did not violate the order. To come to court now and say that because there is a, the reference is made by lead counsel in the notice to claimants that one feels free to do what you did is not good enough as far as I'm concerned . . .
>
>  . . . .
>
> You have a professional obligation to, as counsel for the objector, to point out to the Court your objection. I don't understand it. Maybe I never practiced in New York, but, I didn't think you had a professional obligation to point out your objection with regard to this matter to a newspaper.

The next day, May 20, 1999, the District Court entered an order, fining Sirota $1,000.

On June 18, 1999, Sirota filed a notice of appeal from the order imposing sanctions. We have jurisdiction over this appeal pursuant to the final order doctrine of 28 U.S.C. S 1291. This includes final decisions in attorney disciplinary proceedings. See In re Ashton, 768 F.2d 74 (3d Cir. 1985); In re Abrams, 521 F.2d 1091 (3d Cir. 1975). 5

_____

5. We note that on June 25, 1999, the District Court approved a settlement in the Cendant PRIDES case and certified the judgment embodying that settlement and awarding attorneys' fees to lead counsel as final under Federal Rule of Civil Procedure 54(b). In re Cendant Corp. PRIDES Litig., 51 F. Supp. 2d 537 (D.N.J. 1999), rev'd, 243 F.3d 722 (3d Cir. 2001). If Sirota's appeal from the sanctions order were construed as premature, it would have ripened upon entry of the final judgment in the Cendant PRIDES case. See Lazy Oil Co. v. Witco Corp., 166 F.3d 581 (3d Cir. 1999).

8

II.

The nominal issue on appeal is whether the District Court erred in sanctioning Sirota for violating the October 2, 1998 confidentiality order by speaking to the New York Times. That issue, however, is predicated upon the more basic question of whether the confidentiality order underlying the sanction was properly issued. Because of this dependent relationship, we feel compelled, before even considering the District Court's sanction of Sirota, to first address the propriety of the confidentiality order. What constitutes the proper legal standard for granting a confidentiality order sealing bids is an issue of law, over which we exercise plenary review. See Pansy v. Borough of Stroudsburg, 23 F.3d 772, 783–84 (3d Cir. 1994).

In addition to this dependent relationship, we also have an inherent supervisory power, arising out of Fed. R. Civ. P. 26, to fashion and clarify rules for district courts governing the district courts' power to enter confidentiality orders at the discovery stage or any other stage of litigation. See Pansy, 23 F.3d at 786 & n.16, 789 & n.22. Accordingly, there exists a sufficient basis for us to evaluate the District Court's efforts to preserve the secrecy of bids. In doing so, we conclude that, in deciding to seal the bids, the District Court failed to recognize that the bids were judicial records, subject to the common law presumption of public access. As a result, the District Court failed to articulate the necessary findings to override the presumption of access when issuing the confidentiality order.

A.

It is well-settled that there exists, in both criminal and civil cases, a common law public right of access to judicial proceedings and records. Littlejohn v. BIC Corporation, 851 F.2d 673, 677–78 (3d Cir. 1988). The public's right of access extends beyond simply the ability to attend open court proceedings. Rather, it envisions "a pervasive common law right `to inspect and copy public records and documents, including judicial records and documents.' " Leucadia, Inc. v. Applied Extrusion Tech., Inc., 998 F.2d 157, 161 (3d Cir. 1993). As we explained in Littlejohn, the right of access strengthens confidence in the courts:

9

> The public's exercise of its common law access right in civil cases promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court. As with other branches of government, the bright light cast upon the judicial process by public observation diminishes possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness.

851 F.2d at 678 (citations omitted). In addition,"[a]ccess to civil proceedings and records promotes `public respect for the judicial process' and helps assure that judges perform their duties in an honest and informed manner." Leucadia, 998 F.2d at 161 (citations and internal quotations omitted).

The public right of access clearly applies to the in camera hearing conducted by the District Court, as that hearing was a judicial proceeding. We also believe that the right applies to the bids. Whether or not a document or record is subject to the right of access turns on whether that item is considered to be a "judicial record." Pansy, 23 F.3d at 781. The status of a document as a "judicial record," in turn, depends on whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings. Id. at 780–83. While filing clearly establishes such status, a document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal. See Enprotech Corp. v. Renda, 983 F.2d 17, 20 (3d Cir. 1993); but cf. Pansy, 23 F.3d at 780–83.6 Especially relevant here is the case of Leucadia, in which we held that "there is a presumptive right of public access to pretrial motions of a

_____

6. Pansy held that a settlement agreement not filed with the district court, but submitted to and reviewed by that court, was not a judicial record. However, Pansy's holding is inapplicable here because, among other reasons, unlike the settlement agreement in that case, the records at issue here were submitted at the District Court's request and were generated in connection with the litigation.

nondiscovery nature, whether preliminary or dispositive, and the material filed in connection therewith." 998 F.2d at 164.

In the present case, the District Court's auction procedure transformed the bids into judicial records. The District Court relied on the 1995 Personal Securities Litigation Reform Act ("PSLRA") as authority for the selection by lead plaintiffs of lead counsel. The PSLRA provides: "The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. S 77z-1(a)(3)(B)(v) (emphasis added). Viewing its approval under the PSLRA as a discretionary judgment, the District Court ordered plaintiffs' attorneys to submit bids, In re Cendant Corp. Litig., 182 F.R.D. at 150-51, and the attorneys did so in direct response to the court's command. While not explicitly denominated as such, the bids were essentially submitted in the form of motions to be appointed lead counsel. See id.  at 151 (ordering bidders to describe why they are professionally qualified to be lead counsel). Following the in camera hearing, the District Court ruled, and issued an Order appointing counsel. In re Cendant Corp. Litig. , 191 F.R.D. at 387. That Order, a public document itself, summarized the content of the bids in an encoded chart. Id. In these circumstances, we believe that, at the time of the District Court's confidentiality order, the bids were judicial documents subject to the common law right to access.

B.

The practical effect of the right to access doctrine is to create an independent right for the public to view proceedings and to inspect judicial records. See Pansy, 23 F.3d at 781. The right of public access is particularly compelling here, because many members of the "public" are also plaintiffs in the class action. Accordingly, all the reasons we discussed in Littlejohn for the right of access to public records apply with even greater force here. See p. 10, supra. Protecting the access right in class actions "promotes [class members'] confidence" in the administration of the case. Littlejohn, 851 F.2d at 678. Additionally, the right of access diminishes the possibility

11

that "injustice, incompetence, perjury, [or] fraud" will be perpetrated against those class members who have some stake in the case but are not at the forefront of the litigation. Id. Finally, openness of class actions provides class members with "a more complete understanding of the [class action process] and a better perception of its fairness." Id.

Indeed, the information sealed in this case and kept secret from most of the parties was of the utmost importance in the administration of the case; it was directly relevant to the selection of lead counsel. This point is crucial. In class actions, the lead attorneys have an unusual amount of control over information concerning the litigation. By contrast, class members often have little input into the conduct of the class action and accompanying settlement negotiations, because of the large scale of litigation and the disconnect between defendants' possibly enormous liability and the relatively small recovery available to the individual plaintiffs. The only stage at which class members can exercise effective control is in the selection of class counsel. Throwing a veil of secrecy over the selection process deprives class members of that opportunity.

Thus, there should have been, in the present case, a strong presumption that the bids and the in camera proceeding would be part of an open process, accessible to the public. See Littlejohn, 851 F.2d at 678. That presumption disallows the routine and perfunctory closing of judicial records. Miller v. Indiana Hosp., 16 F.3d 549, 551 (3d Cir. 1994). Our discussion, however, does not end here.

Although the common law right to public access is a recognized and venerated principle, courts have also recognized the accompanying principle that "the right is not absolute." Littlejohn, 851 F.2d at 678; Leucadia, 998 F.2d at 165 (same); Publicker Indus., Inc. v. Cohen , 733 F.2d 1059, 1070 (3d Cir. 1984) (same). The presumption of public access may be rebutted. See Republic of Phillipines v. Westinghouse Elec. Corp., 949 F.2d 653, 662 (3d Cir. 1991). "Every court has supervisory power over its own records and files, and access has been denied where court files

12

might have become a vehicle for improper purposes." Littlejohn, 851 F.2d at 678 (quoting Nixon v. Warner Communications, Inc., 435 U.S. 589, 598 (1978)). Thus, the question becomes, under what circumstances may a district court seal judicial proceedings or documents, such as bids, by means of a confidentiality order. For this question, there are settled standards.

In order to override the common law right of access, the party seeking the closure of a hearing or the sealing of part of the judicial record "bears the burden of showing that the material is the kind of information that courts will protect" and that "disclosure will work a clearly defined and serious injury to the party seeking closure." Miller , 16 F.3d at 551 (citing Publicker, 733 F.2d at 1071). In delineating the injury to be prevented, specificity is essential. See Publicker, 733 F.2d at 1071. Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient. As is often the case when there are conflicting interests, a balancing process is contemplated. "[T]he strong common law presumption of access must be balanced against the factors militating against access. The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption." Leucadia, 998 F.2d at 165 (quoting Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assoc., 800 F.2d 339, 344 (3d Cir. 1986)).

Additionally, because of the peculiar posture of class actions whereby some members of the public are also parties to the class action, and because of the importance of selection of lead counsel to class action plaintiffs, the test for overriding the right of access should be applied in this case with particular strictness. We are guided in the formation of a stricter standard by Miller, where the sealing order warranted exceptional scrutiny because the district court had sealed the entire record. In that case, we held:

> In a case such as this, involving ordinary civil litigation, the district court, before taking such an unusual step, should have articulated the compelling countervailing interests to be protected, made specific findings on the record concerning the effects of

13

> disclosure, and provided an opportunity for interested
> third parties to be heard.

Miller, 16 F.3d at 551 (citations omitted) (emphasis added).
Thus, we hold that a "compelling countervailing interests"
standard is most appropriate here, with the additional
requirement of specific findings. This may or may not
require a hearing.

Therefore, our emphasis here is on the District Court's
denial of public access to the bids and proceedings in
connection with the sealed bid auction employed to select
lead counsel in this case, and we do not focus here nor
decide on the propriety of bid auctions generally.

In re Oracle Sec. Litig., 136 F.R.D. 639 (N.D. Cal. 1991),
the district court case relied upon by the District Court in
the present case, admittedly is one of the earliest cases in
which competitive bids for lead counsel and the propriety of
sealing such bids was considered.7 Oracle opted for
competitive selection of class counsel for a number of
reasons which we decline to explore inasmuch as the issue
of competitive selection is not presented on this appeal.
Suffice it to say, the reasons listed in Oracle for use of
competitive bidding provoke serious reservations and
concerns here,8 but we leave the decision as to whether
competitive bidding is appropriate, justifiable, or desirable
to the future case where that issue is directly raised.

Regardless of whether bidding for lead counsel would be
deemed appropriate, however, we can neither subscribe to
nor affirm the District Court's ruling that the bidding

_____

7. We do note, for background purposes, that lead counsel auctions have
not been widely used by federal courts. See Developments, The Paths of
Civil Litigation, 113 Harv. L. Rev. 1827, 1842 (2000) [Civil Litigation]
(noting that auctions have been used in only four federal district courts,
and only within the securities and antitrust context). Recently, Chief
Judge Becker of this Court formed a task force to examine in detail the
competitive bidding process and the method of selecting lead counsel in
federal class action litigation. See Editorials, Class-Counsel Auctions,
N.J.L.J., Feb. 12, 2000, at 22.

8. Indeed, one district court has affirmatively rejected bid auctions,
holding that such auctions violate the PSLRA. See In re Razorfish, Inc.
Sec. Litig., 143 F. Supp. 2d 304, 311 (S.D.N.Y. 2001).

auction the court conducted should have been closed, i.e., sealed and kept from the very parties to whom our precedents and logic advocate disclosure. Indeed, this very principle was recognized in Oracle, where the court refused to seal or hold secret the bids for class counsel.

The Oracle court did this in part by rejecting claims that an open bidding process would allow the defendants to obtain information about lead counsel's evaluation of the case and might permit them to economically "squeeze" lead counsel by protracting proceedings. The Oracle court opined, as we do, that disclosure of class counsel's bids and compensation arrangements benefits the class because, "[u]nlike the usual attorney-client situation, . . . class members do not participate in the negotiations by which a part of their claim is bargained away." 136 F.R.D. at 645. Moreover, class members are not in a position to monitor the faithfulness of their self-appointed champion. See, e.g., In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768 (3d Cir. 1995) (where the original settlement called for lead counsel to receive attorneys' fees in the amount of $9.5 million, and class plaintiffs received no more than a $1,000 certificate towards a GM truck).

Thus, we generally believe that opening the bidding process (if such a process is to be authorized), while not a panacea for the agency problems in class actions, should facilitate the monitoring of lead counsel by class members and others. The disclosure of bids also comports with the spirit of the Model Rules of Professional Conduct. See Model Rules of Prof 'l Conduct R. 1.5(b) (1983) (requiring communication to the client of the "basis or rate of the fee . . . before or within a reasonable time after commencing the representation").

We find implicit recognition of these principles in the 1985 Third Circuit Task Force report on court-awarded attorneys' fees. In analogous circumstances, the Task Force expressed concern that, when lead counsel seeks fees after a settlement has been reached, "the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit." Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (1985)[hereinafter

15

Task Force Report]. The Task Force Report accordingly recommended that district courts force the negotiation of class counsel's fee, asserting the "critical importance [in] assuring that the compensation plan is negotiated in an open and appropriately arm's length manner." Id. at 256 (emphasis added).

The strong presumption of public access forces district courts to be cognizant of when the reasons supporting sealing in a specific case (if any are found) have either passed or weakened, and to be prepared at that time to unseal bids and allow public access. Even if a sealing order was proper at the time when it was initially imposed, the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain. As we observed in Leucadia, "continued sealing must be based on `current evidence to show how public dissemination of the pertinent materials now would cause the competitive harm [they] claim[ ]." 998 F.2d 157, 167 (3d Cir. 1993) (emphasis added). By establishing a strong presumption in favor of an open process, we intend to instill a measure of consistency into an important area where district courts have varied widely in their practice.9

III.

The heightened standard which we have held must be applied to sealing class action bids is also supported by the language and legislative history of the PSLRA.10 The PSLRA

_____

9. In cases employing competitive bidding to select lead counsel, some district courts have used what appear to be an open, unsealed bidding process. See, e.g., In re California Micro Devices Sec. Litig., 168 F.R.D. 257, 259–60 (N.D. Cal. 1996). Other courts have sealed the bids but later unsealed them when the lead counsel was selected. See, e.g., In re Amino Acid Lysine, 918 F. Supp. 1190, 1192, 1201 (N.D. Ill. 1996); In re Bank One S'holders Class Actions, 96 F. Supp. 2d 780, 782, 785 (N.D. Ill. 2000); In re Wells Fargo Sec. Litig., 157 F.R.D. 467, 468 (N.D. Cal. 1995).
Besides the District Court here, we have found only one other court that has utilized a completely sealed bidding process. See In re Auction Houses Antitrust Litig., 197 F.R.D. 71, 74, 84 (S.D.N.Y. 2000).

10. It should be noted that the District Court applied the provisions of the PSLRA several times in the course of the Cendant litigation, though

16

sets forth a detailed procedure for class members to apply to become lead plaintiffs. Additionally, the PSLRA provides that "[t]he most adequate plaintiff11 shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. S 77z-1(a)(3)(B)(iv).

> The legislative history of the PSLRA explains that the Act's purpose is:
>
> (1) to encourage the voluntary disclosure of information by corporate issuers; (2) to empower investors so that they--not their lawyers--exercise primary control over private securities litigation; and (3) to encourage plaintiffs' lawyers to pursue valid claims and defendants to fight abusive claims.

S.Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683 (emphasis added).

The legislative history also points out that "[i]nvestors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle, based largely on their own financial interests, not the interests of their purported clients." S. Rep., U.S.C.C.A.N. at 685. Additionally:

> A 1994 Securities Subcommittee Staff Report found `evidence * * * that plaintiffs' counsel in many

_____

never in the context of selection of lead counsel. See, e.g., In re Cendant
Corp. Litig., 139 F. Supp. 2d 585 (D.N.J. 2001) (PSLRA barred contribution claims); In re Cendant Corp. Litig. , 109 F. Supp. 2d 285 (D.N.J. 2000) (attorneys' fees awarded pursuant to the PSLRA); In re Cendant Corp. Litig., 109 F. Supp. 2d 235 (D.N.J. 2000) (applied PSLRA in connection with notice of proposed settlement); In re Cendant Corp. Litig., 76 F. Supp. 2d 539 (D.N.J. 1999) (PSLRA requires showing of scienter in securities fraud action).

11. The PSLRA states that the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members (hereinafter in this paragraph referred to as the `most adequate plaintiff ') . . ." 15 U.S.C. S 77z-1(a)(3)(B)(i) (emphasis
added).

> instances litigate with a view toward ensuring payment
> for their services without sufficient regard to whether
> their clients are receiving adequate compensation in
> light of evidence of wrongdoing.' The comment by one
> plaintiffs' lawyer--`I have the greatest practice of law in
> the world. I have no clients.'--aptly summarizes this
> flaw in the current system.

S. Rep., U.S.C.C.A.N. at 685.

To regulate this practice of lawyers, instead of lead plaintiffs, driving securities class actions, Congress enacted the PSLRA, through which, "[s]ubject to court approval, the most adequate plaintiff retains class counsel." H. Conf. Rep. No. 104-369, at 35 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 734. The Senate Committee explained: "This provision is intended to permit the plaintiff to choose counsel rather than have counsel choose the plaintiff." S.Rep. No. 104-98, at 11 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690 (emphasis added).

Congress' clear intent in enacting the PSLRA was to transfer control of securities class actions from the attorneys to the class members (through a properly selected lead plaintiff). The sealing of the bids in the lead counsel auction in this case contravenes this purpose. Instead of allowing the class plaintiffs in this action to choose lead counsel, the District Court selected class counsel through a sealed bidding process which has yet to be unsealed. It also prevented many class plaintiffs and defendants from accessing the bids for lead counsel. Sealing the bids in this case enabled counsel to " `litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrongdoing.' " S.Rep., U.S.C.C.A.N. at 685.12

_____

12. We do recognize that, in this case, the District Court gave lead plaintiffs' counsel the option of matching the most acceptable bid and becoming lead counsel.

IV.

Of course, notwithstanding the limitations on sealing created by the common law public right to access,"[t]he balancing of the factors for and against access is a decision committed to the discretion of the district court, although it is not generally accorded the narrow review reserved for discretionary decisions based on first-hand observations." Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 344 (3d Cir. 1986). The discretion that exists, however, must be exercised properly because the issuance of a confidentiality order overriding the common law right of public access contemplates an analytical process.

In this respect, we hold that the District Court abused its discretion in sealing the bids. Apart from one general and ambiguous reference to "adversarial integrity" and "strategy and tactics," the District Court did not provide any clear reason for why it sealed the bids. The court did not recognize the presumption of access, nor did it engage in balancing process to determine whether the bids were the type of information normally protected or whether there was a clearly defined injury to be prevented. See Publicker, 733 F.2d at 1073 (noting similar procedural deficiencies in the context of the First Amendment right to access); accord Criden, 648 F.2d at 819 (stating that district courts must "provide a firm base for an appellate judgment that discretion was soundly exercised"). Here, before sealing the entire bid record, the District Court should have articulated the "compelling countervailing interests" it found which would authorize the closure through sealing of the matters it sought to protect. Miller, 16 F.3d at 551. No such factfinding or identification of compelling countervailing interests can be found in the District Court's order. We therefore conclude that the District Court's confidentiality order of October 2, 1998, was improperly issued, and therefore, invalid.13

_____

13. In addition to the common law right of access, we note that the Third Circuit has held that the "First Amendment [also] embraces a right of access to [civil] trials." Publicker , 733 F.2d at 1070 (citation and internal
quotations omitted). This right exists independently of the common law

19

V.

In addition to concluding that the October 2, 1998 confidentiality order was improperly issued, we conclude that the District Court erred in finding that Sirota violated the terms of the order. This point is important because, among other reasons, the fine was widely reported in the newspapers and legal journals, and because attorney disciplinary authorities in New York have initiated an inquiry, which is still pending, to determine whether Sirota should be sanctioned in New York based on the same facts that led the District Court to impose the fine.

Sirota's principal argument is that the District Court abused its discretion in sanctioning him $1,000 for

_____

right of access. See Republic of Phillipines v. Westinghouse Elec. Corp., 949 F.2d 653, 659 (3d Cir. 1991). The general rationale behind this right is that "[p]ublic access to civil trials . . . plays an important role in the participation and the free discussion of governmental affairs." Publicker, 733 F.2d at 1070; see also Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 555, 604–05 (1980) ("[T]o the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected `discussion of governmental affairs' is an informed one.").

The First Amendment right of access requires a much higher showing than the common law right to access before a judicial proceeding can be sealed. In Publicker, for example, we stated that "to limit the public's access to civil trials [where First Amendment right to access applies,] there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." 733 F.2d at 1070. We also described certain procedural and substantive requirements that are required when the First Amendment applies. 733 F.2d at 1071–73.

However, the parameters of the First Amendment right of access to civil proceedings are undefined. There remain significant constitutional questions about what documents are subject to its reach. See Littlejohn, 851 F.2d at 680 n.14. Because we conclude that the District Court's confidentiality order did not satisfy the requirements for abridging even the common law right of access, we will not address these issues. See Hagan v. Lavine, 415 U.S. 528, 547 (1974) (noting "the ordinary rule that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available").

20

speaking to a newspaper reporter. " `We review a district court's imposition of sanctions under its inherent power for abuse of discretion.' " Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 75 (3d Cir. 1994) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 55 (1991)). A district court "abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1279 (3d Cir. 1994) (citation and internal quotations omitted).

At the sanction hearing, the District Court informed Sirota that it was proceeding pursuant to L.Civ.R. 101.1, which gives the court broad authority to discipline attorneys. Clearly, the court had authority to proceed under this Rule and under its inherent disciplinary jurisdiction.

The Supreme Court has long established that "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 227 (1821); accord Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510 (1873). This Court, as well, has recognized the authority of district courts to wield sanctioning power, in the form of the court's "inherent authority," where necessary to preserve the integrity of the judicial process. Philippines, 43 F.3d at 73; accord Eash v. Riggins Trucking, Inc., 757 F.2d 557, 560–65 (3d Cir. 1985) (discussing thoroughly the inherent powers of courts); In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984); In re Abrams, 521 F.2d 1094, 1099 (3d Cir. 1975); 11A Charles A. Wright et al., Federal Practice and Procedure S 2960 (2d ed. 1995) (analyzing the inherent power of federal courts to punish in contempt).

We have emphatically stated that federal courts retain the inherent power "to sanction errant attorneys financially both for contempt and for conduct not rising to the level of contempt." Eash, 757 F.2d at 566 (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980)). The Eash court elaborated:

> [The] Supreme Court . . . [has] stat[ed] that the "inherent power" to sanction an attorney was "governed

21

not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." If a court's inherent powers include the ability to do whatever is reasonably necessary to deter abuse of the judicial process, . . . courts must be able to impose reasonable sanctions for conduct by lawyers that falls short of contempt of court.

Id. at 567 (citations omitted).

Requiring courts to await the conclusion of extensive investigation and prosecution procedures following every courtroom infraction would greatly compromise the courts' ability to direct and control the proceedings. Acknowledging the weighty interest judges have in maintaining order in court affairs, we have recognized that "district courts have broad authority to preserve and protect their essential functions." Philippines, 43 F.3d at 73. We have also previously observed that formal rules and statutes do not exhaust a district court's power to control errant behavior:

> To the contrary, the Supreme Court recently reaffirmed that a district court has inherent authority to impose sanctions upon those who would abuse the judicial process. . . . The Supreme Court explained that "[i]t has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."

Id. at 73 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991) (internal quotations and citations omitted)). Before invoking its inherent authority, a court must consider a number of factors:

> Of course, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." "A primary aspect of [a district court's] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and

22

> must also ensure that the sanction is tailored to
> address the harm identified. . . . [T]he court must
> consider the conduct at issue and explain why the
> conduct warrants sanction.

Id. at 74 (quoting Chambers, 501 U.S. at 44).

Here, we are constrained to conclude that no adequate
factual predicate existed to justify the exercise of the
District Court's inherent authority. The proceeding against
Sirota commenced when the court initially charged him
with violating its confidentiality order. Sirota conceded that
he had spoken to the New York Times without initially
approaching the District Court, but insisted that he had
divulged no information of substance:

> I spoke to the New York Times and said we filed a brief
> and if you want to see it, you can see it. And, I have
> confirmed with the author of the article that she was
> quoting from the brief and that I made no substantive
> oral statement to the New York Times. They are
> quoting from our brief.

The District Court did not dispute the truth of Sirota's
assertion. Instead, the court seems only to have stated that
Sirota's behavior breached standards of "good conscience or
. . . good professionalism":

> I hold you to that of a reasonable attorney who, when
> confronted with a specific order of confidentiality,. . .
> before he would broach the subject to a third party
> such as the press, whether generally or specifically, he
> should have, in good conscience or in good
> professionalism at least made contact with the Court to
> insure that whatever he said did not violate the order.

Certainly, a violation of the confidentiality order would
constitute "conduct which abuses the judicial process" and
could justify a sanction. However, the record does not
support a finding that Sirota violated any order.

Amicus counsel, in support of the District Court's order,
argues that Sirota did, in fact, violate the confidentiality
order because Sirota's brief may have, by implication,
identified two bidders for the lead counsel position, himself
and Kirby. The problem with this contention is that Sirota's

23

brief was not under seal, was available to the general public, and did not expressly divulge the identity of any bidder. In essence, the brief is nothing more than a response to the court's order of March 18, 1999, which required that any class member wishing to contest an aspect of the settlement "file said objections, papers and briefs with the Clerk of the United States District Court for the District of New Jersey."

We further observe that, when Sirota asserted at the hearing that all the information recited by the reporter simply derived from material "[w]e filed . . . in our briefs before your Honor," the court responded, "I don't have any problem with that in court. I have no problem with your objecting in court, none whatsoever, none whatsoever." Thus, under the District Court's reading, Sirota was free to present in open court the same material he presented in his brief. The public, including the media, had a right of access to all such material. See Leucadia, 998 F.2d at 161 ("the public has the right to inspect and copy judicial records"). While it would be improper for an attorney to divulge the substance of a case that the court has deemed confidential, the public's right of access demands that the attorney must, at the very least, be able to refer a reporter to a public document.

Finding that his written submissions did not offend the confidentiality order, the Court, instead, objected solely to Sirota's contact with the media. However, because the District Court could not identify any improper extrajudicial statement, it could not sanction Sirota for contacting the media in violation of the confidentiality order. See L. Civ. R. 105.1 ("Notwithstanding [the Local Rules on extrajudicial statements], a lawyer involved in the litigation of a matter may state without elaboration . . . the information contained in a public record."). Under these circumstances, we find no violation of the court's confidentiality order and no evidence of any misconduct.

VI.

For the foregoing reasons, we will vacate the District Court's sanction, and we direct that the District Court enter

24

an order unsealing all sealed bids and documents in the record if it has not already done so.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

25